UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
VALANCE COLE,

                            Petitioner,

— against —

JAMES WALSH, Superintendent,
Sullivan Correctional Facility,

                            Respondent.
-----------------------------------------------------------------X

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y
★ SEP 29 2009
P.M.
TIME A.M.

**MEMORANDUM and ORDER**

05-CV-736 (SLT) (SMG)

**TOWNES, United States District Judge:**

Valance Cole ("Petitioner") was convicted after a jury trial of manslaughter in the first degree, assault in the second degree, and criminal possession of a weapon in the second degree in connection with the August 4, 1985, shooting death of Michael Jennings. On August 7, 1987, the state court sentenced Petitioner to 12 ½ to 25 years on these counts. The conviction was affirmed on appeal in *People v. Cole*, 601 N.Y.S.2d 352 (N.Y. App. Div. 1993), and three prior post-conviction motions to vacate his conviction were denied by New York State courts. Petitioner has filed what amounts to his third petition for the writ of habeas corpus. For the reasons stated below, this petition is denied.

## BACKGROUND

On August 4, 1985, at approximately 1:00 P.M., near the corner of Fulton Street and Spencer Place, Brooklyn, New York, Michael Jennings was shot and killed. The police investigated the shooting and interviewed a number of witnesses. Several witnesses described the shooter as a black man, mid-twenties, approximately five-eight with a slim build and dark

1

skin. Bishop Hr'g Tr. 430.[1] Petitioner, at the time of the killing, was 39 years old, six feet tall, and 165 pounds. *Id.* at 431.

Shortly after the shooting, Jeffrey Campbell was arrested when a police officer observed him fleeing the scene. *People v. Cole*, Mem. 2 n.1 (N.Y. Sup. Ct. Sept. 12, 2003). He was released based on evidence that he was not the shooter. *Id.* On February 1, 1986, Campbell, while in jail on an unrelated case, named Petitioner as the shooter. *Id.* at 2. Subsequently, Charles Ford, another eyewitness whose brother-in-law was also shot during the incident, also identified Petitioner as the shooter. *Id.* On February 10, 1986, Ford viewed a police line-up and recognized Petitioner as the person who shot and killed Jennings, and shot and wounded his brother-in-law. Ford Tr. 46, 148. A third eyewitness, Winston Fleming, told police that the shooter was someone who worked for a person by the name of "Scotty," but he could not identify the shooter by name or by photograph. Bishop Hr'g Tr. 411. One of the police officers investigating the shooting, Detective Wilbert Bishop, never connected Petitioner to "Scotty" nor interviewed "Scotty." *Id.* at 431. A few months later, Fleming identified someone other than Petitioner as the shooter in a police line-up. *Id.* at 419.

On February 27, 1986, Petitioner was indicted for murder in the second degree, manslaughter in the first degree, assault in the second degree, and criminal possession of a weapon in the second degree. Prior to the indictment, Winston Fleming and Petitioner testified to the grand jury that Petitioner was not the shooter.[2] Campbell, however, identified Petitioner as

---

[1] Page numbers cited with "Hr'g" denote the transcript of the hearing on Petitioner's third motion to vacate. All other transcript numbers refer to Petitioner's original state court trial.
[2] Detective Bishop claims that, on March 26, 1986, after his grand jury testimony, Fleming told him that he had lied to the grand jury and that Petitioner's brother had paid for him to change his testimony. Bishop Hr'g Tr. 418-19. Nevertheless, no charges were ever brought against Petitioner's brother or Fleming in connection with this allegation. *Id.* at 438-39.

2

the perpetrator to the grand jury. In exchange for his grand jury testimony, Campbell received a bail reduction on a pending robbery case. Campbell Tr. 92, 103, 126.

On March 17, 1987, a jury trial commenced against Petitioner. The People called Campbell and Ford as witnesses. Campbell testified that he observed Fleming, Jennings, and Petitioner arguing about drugs on that day. *Id.* at 78. Standing about 30-feet from the men, Campbell saw Petitioner fire a gun three times at Jennings, who then started running in his direction and eventually collapsed from a gunshot. *Id.* at 77, 80, 82. Ford, who overheard Petitioner and Jennings arguing over drugs the day before, also witnessed as Petitioner pulled out a gun on August 4, 1985, and started shooting at Jennings. Ford Tr. 140-42.

Another witness, Valerie Cassidy, testified on Petitioner's behalf. Cassidy maintained that she was coming up to the intersection of Fulton Street and Spencer Place at the time of the shooting and that she witnessed the incident and was positive that Petitioner was not the shooter. Cassidy Tr. 262-64, 267, 269. According to Cassidy, the shooter was a man about 25-years old whom she never saw before. *Id.* at 265, 279. Petitioner also presented an alibi witness, his mother-in-law Lucy Yates, who stated that she brought Petitioner his lunch at his apartment at about noon on August 4, 1985, and that she stayed with him until about 1:15 p.m. that day. Yates Tr. 313-14.

On March 23, 1987, the jury convicted Petitioner of manslaughter in the first degree, assault in the second degree, and criminal possession of a weapon in the second degree. He was acquitted on the murder charge. On August 7, 1987, the state court sentenced Petitioner to 12 ½ to 25 years on the manslaughter charge and imposed lesser concurrent sentences on the other counts. The conviction was affirmed on appeal in *People v. Cole*, 601 N.Y.S.2d 352 (N.Y. App.

Div. 1993), and two prior post-conviction motions to vacate his conviction were denied by New York State courts.

On October 23, 1997, and February 3, 1998, Petitioner filed two *pro se* petitions for the writ of habeas corpus with this Court and they were assigned to Judge Nickerson. On July 23, 1999, Judge Nickerson essentially consolidated the two petitions and dismissed the petition as untimely under 28 U.S.C. § 2244(d). On appeal, the Second Circuit remanded the petition to determine whether Petitioner was entitled to equitable tolling of the statute of limitations. On remand, Judge Nickerson ruled that Petitioner had not met the standard for equitable tolling and reaffirmed the dismissal of the petition as untimely.

On June 9, 2002, Petitioner moved in New York Supreme Court to vacate his conviction pursuant to N.Y. Crim. Pro. L. § 440.10 on the grounds of newly-discovered evidence. Under § 440.10(1)(g), a court may vacate a conviction if

> New evidence has been discovered since the entry of a judgment based upon a verdict of guilty after trial, which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant[.]

N.Y. Crim. Pro. L. 440.10(1)(g).

On September 12, 2002, the court ordered a hearing on (1) the newly-discovered evidence and stated that it would also consider all evidence in support of (2) a possible *Brady* claim and (3) a "free-standing" claim of actual innocence under the New York State Constitution.

At the hearing, Petitioner called four alleged eyewitnesses – Tilden Edwards, Bertram Carter, Gregory Derrell, and Robert Adams, who all testified that they saw the shooting and that Petitioner was not the shooter. They stated that they had known both the victim and Petitioner

for years prior to the shooting and claimed that Petitioner was not at the scene of the crime. All four witnesses identified a Guyanese individual, known as "Denzel," "GT," or "Dooley," as the shooter. Each witness had an extensive criminal record and each had inconsistencies in his testimony. As Petitioner conceded in his post-hearing summation, "[u]pon cross examination they confused the sequence of events in the police investigation and trial and their memories were clearly effected [sic] by the passage of time and years of drug abuse." Def's Summation Following C.P.L. 440.10 Hr'g 4.[3]

Petitioner also submitted a videotape made in 1995 of Campbell, one of the People's original trial witnesses, stating that he lied at the trial and that Petitioner was innocent. Ann Wagner, Petitioner's cousin, testified at the § 440.40(1)(g) hearing, describing how she procured Campbell's videotape. Wagner claimed that Petitioner telephoned her from jail and stated that Campbell was dying and wanted "to clear his conscience." Wagner Hr'g Tr. 248. She stated

---

[3] As representative of the witnesses's testimonies, the Court recounts Tilden Edwards appearance at the § 440.10 hearing. He testified that on the morning of August 4, 1985, he was sitting with the victim, Winston Fleming, and several others on Fulton Street. Edwards Hr'g Tr. 9-10, 29-30, 46-47, 84. A man named "Denzel" walked over to Fleming and told him, "I'm going to kill you. . . ." *Id.* at 11-12. An argument then ensued between Fleming, Jennings and Denzel. At that point, Edwards claims that Denzel fired a gun approximately three or four times at Jennings. *Id.* at 12-13. Edwards stated that Petitioner was not present at the scene of Jennings's killing. *Id.* at 15, 40.
    On direct examination, Edwards claimed that he was interviewed by Detective Bishop at the scene immediately following the shooting and that Bishop showed him a picture of Petitioner at the precinct that day. *Id.* at 15-16. Edwards told Bishop that the shooter was not Petitioner but that it was Denzel. *Id.* at 43. On cross-examination, when Edwards was confronted with police records indicating that he was not interviewed by the police until five weeks after Jennings's killing, Edwards responded, "I can't remember those dates." *Id.* at 49, 56-57, 58. Edwards later conceded that police did not show him Petitioner's photograph on the first day he was interviewed. *Id.* at 54-55. Later, Edwards again reversed himself and maintained that Petitioner's photograph was shown to him "from day one." *Id.* at 70. Edwards also admitted that he did not provide the name "Denzel" to the police during the initial interview because "[he] couldn't remember the guy." *Id.* at 51-52.
    Edwards admitted that he had three felony convictions and several misdemeanor convictions between 1977 and 2002. *Id.* at 35. Edwards acknowledged that he had smoked "a lot of weed" in his lifetime and that he had smoked marijuana the weekend before he testified at the hearing. *Id.* at 21.

5

that she drove to Brooklyn in search of Campbell, even though she did not know who Campbell was or where he was located. *Id.* She conceded that "[y]ou could hardly understand what [Campbell] was saying" on the videotape. *Id* at 254. Campbell died subsequent to the taping of the video. The videotape was submitted in a previous state court motion to vacate the judgment and rejected as a basis for vacating the conviction.

Finally, an investigator for Petitioner, Carl King, testified at the hearing that the other eyewitness at Petitioner's trial, Charles Ford, had recanted his previous testimony to him. King also maintained that Ford told him that he lied about witnessing an argument between Petitioner and Jennings the night before the shooting. King Hr'g Tr. 332.

At the hearing, the People called Ford to testify and he denied that he had ever recanted his trial testimony against Petitioner. Ford Hr'g Tr. 183-84. Ford stated that King appeared at his house one day in February, 2002, and told Ford that he had "identified the wrong man" at Petitioner's trial. *Id.* at 184, 190. When King asked Ford to sign an affidavit recanting his testimony, Ford refused to do so. *Id.* at 184-85. Ford received several visits and calls from King and Petitioner's attorney. Ford reiterated that he had not mistakenly identified Petitioner and that he identified "the right man" at the trial. *Id.* at 186-87.

By an order dated September 12, 2003, the court rejected Petitioner's three claims and denied the motion to vacate the judgment of conviction. With respect to the freestanding actual innocence claim, the court made several findings:

1. The credibility of the defendant's witnesses is questionable in light of their extensive criminal history. However, this does not make the witnesses as a matter of law incredible.
2. This court has already found that parts of the defendant's witnesses' testimony is incredible in one aspect, and thus there is justification for rejecting all of their testimony.
3. The sixteen year delay by the witnesses in claiming that the defendant is innocent affects their credibility.

4. All the descriptions given to the police at the time of the incident do not match that of the defendant's appearance at the time of the crime.
5. The stories of the witnesses regarding the crime are consistent with each other and with the defendant's trial witnesses.
6. The time line testified to by the defendant's hearing witnesses is inconsistent with documentary evidence and the testimony of the police officers called at the hearing. Some of the factual allegations made by the defendant's hearing witnesses were contradicted by the police testimony.
7. There is evidence that the defendant or a person on his behalf (his brother) threatened and bribed certain witnesses. This is evidence of consciousness of guilt.
8. There was nothing about the demeanor of the defendant's hearing witnesses that would cause the court to disbelieve their testimony (although some of the previous reasons would be grounds).

*Cole*, Mem. at 18-20 (citations omitted).

The court denied Petitioner's actual innocence claim on the grounds that he failed to prove by clear and convincing evidence that no reasonable juror could convict him. Nevertheless, the court concluded that Petitioner had shown that he was "probably innocent (more likely than not approximating 55%)." *Id.* at 20. The court remarked, "[t]he reason the court has put a percentage in this decision is for the purpose that should an appellate court adopt a standard between 'probably innocent' and 'clear and convincing', the appellate court can apply that standard to this case without remanding the matter." *Id.* at 20 n.13. Petitioner attempted to appeal the court's order, but the New York Appellate Division denied his application for leave to appeal on November 19, 2003.

Petitioner then sought permission from the Second Circuit to file a second or successive habeas petition solely on the claim of actual innocence. The Second Circuit granted the Petitioner's request on January 4, 2005. The instant petition for the writ of habeas corpus followed.

## DISCUSSION

7

In his petition to vacate his judgment of conviction pursuant to 28 U.S.C. § 2254, Petitioner has alleged that the new evidence presented to the New York State Supreme Court establishes a credible actual innocence claim. In this petition, Petitioner does not allege an independent constitutional error or that his continued incarceration would deprive him of any specific federal constitutional right; thus, Petitioner's claim amounts to a freestanding claim of actual innocence.

Courts have yet to precisely resolve the question of whether a freestanding claim of actual innocence may serve as a basis of habeas relief. The Supreme Court first faced the question in the death penalty context in *Herrera v. Collins*, 506 U.S. 390, 400 (1993). While the Court acknowledged that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceedings," the Court refused to definitively rule out that possibility. *Herrera*, 506 U.S. at 400. Instead, the Court assumed, "for the sake of argument," that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id.* at 417. The Court then found that the petitioner in the case failed to meet the proper (hypothetical) threshold to succeed on such a ground. *Id.* In several concurrences, however, several Justices left further hints on the efficacy of a freestanding actual innocence claim, at least in the capital context. For example, Justice O'Connor, joined by Justice Kennedy, observed that she "cannot disagree with the fundamental legal principle that executing the innocent is inconsistent with the Constitution." *Id.* at 419. Thirteen years later, the Supreme Court was again invited to answer the question left open in *Herrera* and hold that freestanding innocence

8

claims are viable avenues of habeas relief. *House v. Bell*, 547 U.S. 518, 554-555 (2006). The Court declined the invitation, but once more analyzed the question assuming a cognizable claim existed. *Id.* at 555.

Several district courts in this Circuit have taken the Supreme Court's reluctance to recognize a freestanding innocence claim as a cue to declare that no such basis of relief exists. *See, e.g., Rojas v. Woods*, 2008 WL 2875082, at *12 (S.D.N.Y. July 25, 2008) ("litigants relying on an allegedly improper denial of an application pursuant to N.Y. Crim. Proc. L. § 440.10(1)(g) have [been denied] habeas relief on the ground that there is no federal constitutional right at issue"); *Pimentel v. United States*, 2008 WL 2151796, at *7 (S.D.N.Y. May 21, 2008) ("Had the Court construed Pimentel's habeas claim as one of actual innocence claim . . ., that claim would not have been cognizable."); *Ortiz v. Barkley*, 2008 WL 2266313, at *9 (S.D.N.Y. June 3, 2008) ("actual innocence is not itself a constitutional claim"); *Edwards v. United States*, 2005 WL 1522743, at *3 (E.D.N.Y. July 27, 2005); *Bravo v. Couture*, 2003 WL 22284147, at *4 (E.D.N.Y. Aug. 21, 2003) ("Habeas corpus review does not extend to 'freestanding claims of actual innocence.'"); *Arce v. Comm'r of Corr. Servs.*, 2007 WL 2071713, at *4 (E.D.N.Y. July 17, 2007) ("Courts in this Circuit have repeatedly held that claims of innocence without reliance on constitutional infirmities in the trial do not present a ground for federal habeas corpus relief.").

The Second Circuit has also shown a disinclination to permit a freestanding actual innocence claim. *See Ortega v. Duncan*, 333 F.3d 102, 108 (2d Cir. 2003); *United States v. Quinones*, 313 F.3d 49, 68 n.16 (2d Cir. 2002) ("[T]he Court expressly stated in *Herrera* that a claim of 'actual innocence' is not itself a constitutional claim.") (internal citation omitted); *Greene v. Walker*, 1999 WL 1489805, at *1 (2d Cir. Dec. 29, 1999) (holding that a claim of

actual innocence, standing alone, "fails to demonstrate a constitutional defect that would undermine the underlying conviction"). In *Quinones*, the Second Circuit read *Herrera* to establish "that there is no fundamental right to the opportunity for exoneration even before one's execution date, much less during the entire course of one's natural lifetime." 313 F.3d at 69. The court reasoned that "at some point," the judicial review process has to come to an end "despite the purely theoretical possibility that the defendant might have been able to demonstrate his innocence in the future." *Id.* at 68.[4]

Following the strictures of the Second Circuit and the majority of courts in the Circuit, this Court assumes that a freestanding actual innocence claim does not constitute a cognizable ground for habeas relief and denies this petition. Nevertheless, even assuming such a right exists, and further assuming that it exists in the non-capital context, the Court concludes that Petitioner does not satisfy whatever burden a hypothetical freestanding innocence claim would require.

---

[4] Not all courts have agreed that *Herrera* should be interpreted to foreclose the possibility of a freestanding actual innocence claim. *See, e.g., McKithen v. Brown*, 565 F. Supp. 2d 440, 457 (E.D.N.Y. 2008) (finding the "difficult question" of whether actual innocence is a freestanding ground for habeas relief unresolved); *Sacco v. Greene*, 2007 WL 432966, at *3 (S.D.N.Y. Jan. 30, 2007) (analyzing the *Herrera* concurrences and finding "at least five of the Justices apparently would in a proper case affirmatively hold that a free standing claim of innocence may be litigated in a habeas petition"); *United States v. Quinones*, 196 F. Supp. 2d 416, 419 (S.D.N.Y. 2002), *rev'd by* 313 F.3d 49 (2d Cir. 2002) (describing *Herrera*'s declaration that "our habeas jurisprudence makes clear that a claim of 'actual innocence' is not itself a constitutional claim," as "plainly dictum"); *Boyde v. Brown*, 404 F.3d 1159, 1168 (9th Cir. 2005) (recognizing a freestanding actual innocence claim although the petitioner "must affirmatively prove that he is probably innocent"); Matthew J. Mueller, *Handling Claims Of Actual Innocence: Rejecting Federal Habeas Corpus as the Best Avenue for Addressing Claims of Innocence Based on DNA Evidence*, 56 CATH. U. L. REV. 227, 248 (2006) ("In practice, the circuits have interpreted the freestanding Herrera actual innocence claims in a variety of ways, including that they exist but require an extraordinary showing, that they exist but are restricted to capital cases, that they exist but only where there is no state post-conviction avenue available, or that they do not exist at all."). Even Respondent in this case maintains that a defendant's continued incarceration would violate due process "if a defendant is actually innocent." Respondent's Mem. Opp. Pet Writ Habeas Corpus 61 n.12.

In a series of cases, the Supreme Court suggests that a fairly- and constitutionally-convicted petitioner claiming actual innocence faces a strenuous and exacting burden to prove his innocence in a habeas petition. In *Herrera,* the Court described the threshold for any hypothetical freestanding innocence claim as "extraordinarily high." 506 U.S. at 417. In *Schlup v. Delo*, 513 U.S. 298, 327 (1995), the Court established that a "gateway" actual innocence claim may serve to excuse a procedural bar to reviewing underlying constitutional claims if the petitioner can show that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."[5] In *House*, the Court gave fuller breadth to *Herrara*'s "extraordinarily high" standard describing it as "requir[ing] more convincing proof of innocence than *Schlup*." 547 U.S. at 555.

Accordingly, at a minimum, Petitioner must establish proof more indicative of innocence than required by *Schlup*. This disparity is warranted because a petitioner making a *Herrera* claim is presumed to have received a trial free of constitutional error. "[W]hen a petitioner has been tried before a jury of his peers, with the full panoply of protections that our Constitution affords criminal defendants . . . it is appropriate to apply an extraordinarily high standard of review." *Schlup*, 513 U.S. at 315-16 (internal citations and quotations omitted). Under a "gateway" actual innocence claim, however, the petitioner asserts some additional constitutional error at trial and, thus, the "conviction may not be entitled to the same degree of respect as one, such as *Herrera*'s. . . ." *Id.* at 316. Indeed, *Herrera*'s exacting standard reflects the paramount importance of the trial (and not habeas courts) as the proceeding charged with determining guilt or innocence and ensures that federal habeas courts will not lightly overturn trial results.

---

[5] For an explanation of the "gateway" actual innocence claim, see *Doe v. Menefee*, 391 F.3d 147 (2d Cir. 2004).

Here, the Court finds that Petitioner's claim could not satisfy the lower *Schlup* standard and, thus, he necessarily falls short of the threshold implied in *Herrera*. In analyzing a claim under *Schlup*, courts first determine "whether the new evidence is trustworthy by considering it both on its own merits and, where appropriate, in light of the pre-existing evidence in the record." *Doe v. Menefee*, 391 F.3d 147, 161 (2d Cir. 2004). Next, "reviewing courts consider *all* evidence without regard to its admissibility. . . ." *Id.* at 162. In evaluating the record as a whole, the habeas court may make its own credibility determinations as to both the new evidence and the evidence already in the record. *Id.* at 163. Finally, "[o]nly after examining all evidence is the court able to determine whether new evidence truly throws the petitioner's conviction into doubt, or whether it is so overwhelmed by the weight of other evidence that it is insufficient to raise a question as to a petitioner's factual innocence." *Id.* at 162. In this light, "court[s] must consider how reasonable jurors, fairly examining all of the evidence presented, would assess the petitioner's guilt or innocence." *Id.* at 163.

Petitioner bases his claim of actual innocence on the following evidence: (1) the 1994 recantation of eyewitness, Jeffery Campbell, who had testified for the prosecution at trial and had identified Petitioner as the shooter; (2) an alleged recantation to a defense investigator by the other eyewitness, Charles Ford, who also had testified for the prosecution at trial and had identified Petitioner as the shooter; and (3) the testimonies of four-additional alleged eyewitnesses, Tilden Edwards, Bertram Carter, Gregory Derrell, and Robert Adams, who all claimed to have witnessed the shooting and who alleged that Petitioner was not the shooter.[6]

Nevertheless, the state court judge found that the "credibility of the defendant's witnesses is questionable in light of their extensive criminal history," "that parts of the defendant's

---

[6] At his original trial, Petitioner also (4) presented two alibi witnesses, his mother-in-law Lucy Yates and his cousin Ann Wagner.

witnesses' testimony is incredible in one aspect, and thus there is justification for rejecting all of their testimony," that "the sixteen year delay by the witnesses in claiming that the defendant is innocent affects their credibility," that "the time line testified to by the defendant's hearing witnesses is inconsistent with documentary evidence and the testimony of the police officers called at the hearing," that "[s]ome of the factual allegations made by the defendant's hearing witnesses were contradicted by the police testimony," and that "[t]here is evidence that the defendant or a person on his behalf (his brother) threatened and bribed certain witnesses." *Cole*, Mem. at 18-20. In addition, this Court finds that the inconsistencies in these witnesses' testimonies, as acknowledged by Petitioner, severely undermine their credibility.

Moreover, Charles Ford countered the claim that he recanted his identification of Petitioner to a private investigator. In his hearing testimony, Ford unambiguously reiterated that he was present at Jennings's shooting and that his testimony at Petitioner's original trial was truthful. He reaffirmed that the person he identified as the shooter at the trial was the "right guy."

Accordingly, even in light of the newly-discovered evidence, a reasonable juror, "fairly examining all of the evidence presented," could credit the testimony of Ford over the questionable evidence adduced at the § 440.10(1)(g) hearing and resolve to convict Petitioner. *See Doe*, 391 F.3d at 163. Indeed, this Court's role is not to overturn an otherwise constitutionally-sound conviction merely by the presence of reasonable doubt. *Id.* Instead, this Court must make a "probabilistic analysis" whether "it is more likely than not that no reasonable juror would have found the defendant guilty." *Id.* (internal citation and quotation omitted). Weighing the evidence in the record, this Court could not say that it is probable that no reasonable juror would find Petitioner guilty.

13

The Court acknowledges that the state court concluded that Petitioner is "probably innocent (more likely than not approximately 55%)." Nevertheless, as a mixed question of law and fact, the state court's determination of actual innocence is not entitled to deference by this Court. *See Doe*, 391 F.3d at 163 (reviewing "the determination as to whether no reasonable juror would find a petitioner guilty beyond a reasonable doubt . . . *de novo*"). Furthermore, the state court's determination that Petitioner is "probably innocent" does not amount to the finding that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt. For the same reasons stated in the state court's opinion, the evidence putatively creating reasonable doubt is highly suspect. A reasonable juror could justifiably disregard this evidence in favor of the consistent accounts of Ford. Thus, Petitioner has not established even the lesser standard that it is more likely than not that no reasonable jury would vote to convict him.

## CONCLUSION

For the foregoing reasons, Petitioner's petition for the writ of habeas corpus is denied.

**SO ORDERED.**

Dated: Brooklyn, New York
September 25, 2009

/s/
SANDRA L. TOWNES
United States District Judge